## American Agricultural Chemical Company v. McKinney.

(Decided February 13, 1917.)

### Appeal from Rockcastle Circuit Court.

1.  Agriculture—Fertilizers—Analysis of Before Being Sold.—Under section 1822 of the Kentucky Statutes, it is made the duty of manufacturers of commercial fertilizer to have the same analyzed by the State Agricultural Experiment Station before being sold in this State, and to have labels placed on each package setting forth the analysis.

2.  Agriculture—Fertilizers—Purchaser May Have Analysis Made.—Any purchaser of commercial fertilizer may send a sample, as provided in section 1822 of the Kentucky Statutes, to the Agricultural Experiment Station and have the same analyzed free of cost.

3.  Agriculture — Fertilizers — Analysis for Purchaser — Compliance With Statute.—The statute permitting purchasers of fertilizer to send samples of it to the experiment station for analysis, should be liberally construed and a substantial compliance with the statute will be sufficient to show that the sample was properly selected and the analysis properly made; but unless the substantial requirements are observed, the analysis will not be of value to the purchaser in a suit against him.

4. Agriculture—Fertilizers—Evidence of Farmers That it Was Worthless—When Competent and When Not.—When the manufacturer of fertilizer has complied with the statute and the fertilizer contains the percentage of essential ingredients shown in the label, the purchaser will not be allowed to defeat a suit for the recovery of the purchase price by showing that he did not get good or any results from its use. But when the manufacturer has not complied with the statute, then evidence that good results were not obtained from the use of the fertilizer will be admissible in a suit to recover the purchase price.

5. Agriculture—Fertilizers—Guaranty of Manufacturer.—A fertilizer company is only required to furnish that character and quality of fertilizer described in the analysis made by the experiment station and set out in the labels attached to the packages it offers for sale. The observance of these statutory requirements takes the place of the ordinary express or implied guaranty. There is no implied guaranty on its part that the fertilizer will be beneficial in the cultivation of any crop. Its whole guaranty is contained in its label.

6. Agriculture—Fertilizers—Effect on Contract for Purchase of When Analysis of Sample Sent by Purchaser Shows Deficiency.—If the purchaser sends to the experiment station a sample, in substantial conformity to the requirements of the statute, and the analysis shows that the fertilizer contains a less percentage of the essential ingredients than the description contained in the label, he can rely on this fact alone to defeat a recovery in a suit to collect the purchase price of the fertilizer.

7. Agriculture—Fertilizers—Defense Guarantor of Notes Taken for Purchase Price May Make.—The guarantor of notes taken for the purchase price of fertilizer can avail himself of any defense that the purchaser can set up.

C. C. WILLIAMS and E. R. GENTRY for appellant.

BETHURUM & LEWIS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, the American Agricultural Chemical Company, a manufacturer of farm fertilizers, appointed in the years 1910 and 1911, the appellee, McKinney, its agent at Mount Vernon, in Rockcastle county, for the sale of its fertilizers to farmers in that vicinity. It had a written contract in each of these years with McKinney by which the payment of all notes that he took from farmers for fertilizers sold them, were guaranteed by him, and pursuant to this contract McKinney did guarantee the payment of a number of notes that the farmers who had executed them refused to pay. Thereupon

the chemical company brought this suit against McKinney upon his contract of guaranty.

After setting out its cause of action in proper form, it further averred that it had, in each of the years, "and before it sold or furnished any of said fertilizer to the defendant, furnished to the Director of the Agricultural Experiment Station, of the Agricultrual and Mechanical College of Kentucky, known as the Kentucky Agricultural Experiment Station, a sealed quantity of such commercial fertilizer, not less than one pound, sufficient for analysis, accompanied by an affidavit that the sample so furnished was a fair and true sample of the commercial fertilizer which the plaintiff company desired to sell in the state of Kentucky, and said affidavit also gave the name and address of the plaintiff company, the names of the fertilizers to be sold, the number of net pounds in each package, the minimum percentage of the essential ingredients guaranteed in each fertilizer in the form and manner as prescribed by said director.

"The director of said experiment station, upon receipt of said affidavit and samples issued to the plaintiff company labels, as prescribed by law, giving the names of fertilizers, the number of pounds in each package, the date of said analysis, the estimated value per hundred of the fertilizer, the minimum percentage composition in terms approved by said director as certified to in affidavit furnished by the plaintiff company, together with a certificate from the said director over his facsimile signature authorizing the sale of such fertilizer according to the provision of law.

"The plaintiff avers and charges that the fertilizer furnished the defendant was labeled with the analysis as made by the director of the agricultural experiment station, and that all the fertilizer furnished the defendant was of the kind and grade as the sample furnished by the plaintiff to the said director for analysis."

For answer to this suit, McKinney set up that the fertilizer was found to be of no value by the farmers to whom he sold it and from whom he took the notes and for this reason they refused to pay the notes. That on account of the worthless character of the fertilizer, there was no consideration for the notes executed by the farmers and consequently he was not bound by his guaranty to pay the notes.

On a trial of the case before a jury, there was a verdict for McKinney, and the chemical company, although the amount involved is less than five hundred dollars, filed in this court a copy of the record and has moved the court to grant it an appeal. After considering the record, we have reached the conclusion that the motion for an appeal should be sustained.

The grounds relied on for reversal will be noticed in the course of the opinion. Before, however, coming to a discussion of the questions in the case, it may be well to refer to the statutes on the subject of farm fertilizers. In section 1822, subsection 1, of the Kentucky Statutes, it is provided that in each year before any person or company shall sell or offer for sale in this state any commercial fertilizer, it shall furnish to the director of the agricultural experiment station "a sealed quantity of such commercial fertilizer, not less than one pound, sufficient for analysis, accompanied by an affidavit that the sample so furnished is a fair and true sample of a commercial fertilizer which the said person or company desires to-sell in this state, and said affidavit shall also state the name and address of the manufacturer, the name of the fertilizer, the number of net pounds in each package, and the minimum percentages of the essential ingredients guaranteed in each fertilizer, in such form and manner as may be prescribed by said director."

In subsection 2 it is provided that the director of the experiment station shall furnish to the person or company labels on which shall be printed the name and address of the manufacturer, the name of the fertilizer, the number of pounds in each package, the date of the analysis, and the composition of the fertilizer.

In subsection 9 it is provided that the label attached to any package sold or offered for sale shall be accepted as the guaranty of the manufacturer that the fertilizer contains the kinds and amount of essential ingredients printed on the tag, and that any person attaching a fraudulent label or a label representing it to contain a larger percentage of any one or more of the essential ingredients than is actually found by analysis to be contained in the fertilizer shall be punished by a fine fixed in the statute.

This statute further provides in subsection 8 that any purchaser of commercial fertilizer for his own use

and not for sale may send a sample of the same to the experiment station for analysis. And that: "Such samples for free analysis shall be taken by the purchaser in the presence of the person, company or agent selling the fertilizer from at least ten per cent. of the sacks or other packages comprising the whole lot purchased, and shall be thoroughly mixed, and at least one pound of the material after mixing must be put into a jar or can, securely sealed and marked in such a way as to surely identify the sample and show by whom it was sent, without giving the name of the fertilizer or the person from whom it was purchased, and must be forwarded to the director of the Kentucky Agricultural Experiment Station, Lexington, Kentucky. The purchaser shall also send with the sample a certificate signed by himself and witness, or by two witnesses, stating the sender has purchased the fertilizer for his own use and not for sale, and that the sample was taken in the manner prescribed in this section: *Provided, however,* That if the person, company or agent shall refuse to witness the taking of the sample, then the sample may be taken at the time of the purchase in the manner already described in the presence of two witnesses, who shall certify to the manner of taking the sample. The purchaser shall preserve the official label from one of the bags or other packages sampled, to be sent to the director after having received the report of the analysis of the sample, and at the same time he shall furnish to the director the name and address of the firm of whom the fertilizer was purchased, and the amount purchased, and any person having sent a sample for free analysis, under the provisions of this section, who shall, after having received the report of analysis of the same, refuse to furnish the required information, shall thereafter forfeit the privilege of free analysis of fertilizers under this section. But if any sample shall have been submitted for free analysis without all the requirements of this section having been complied with, the director shall inquire into the case, and may accept the sample for free analysis if he believes it is a fair sample of the fertilizer as it was delivered to the purchaser."

The evidence on behalf of the chemical company consisted of the testimony of its superintendent, and general manager, and that of the fertilizer chemist of the experiment station, and we think it shows that the

provisions of the statute applicable to manufacturers of commercial fertilizer to be offered for sale in this state had been complied with by it in each of these years. The evidence of the experiment station chemist was further to the effect that the analyses made by him in these years of the fertilizer showed that it contained a higher percentage of the essential ingredients of the fertilizer than the manufacturer guaranteed it to contain.

It is, however, contended by counsel for McKinney that the evidence introduced by the chemical company does not show that it complied with the statutory requirements in furnishing samples of its fertilizers to the experiment station for analysis. It will be noticed that the statute provides that the sample furnished by the fertilizer company to the experiment station shall be accompanied by an affidavit that the sample so furnished is a fair and true sample of the fertilizer which the company desires to sell in this state and shall state the name and address of the manufacturer, the name of the fertilizer and other things mentioned in the statute. And the argument is made that the evidence does not show that this affidavit accompanied the sample sent to the experiment station by the chemical company. But we think the evidence does show that the sample was accompanied by the statutory affidavit. Donnelly, the manager of the chemical company, was asked: "Q. State whether or not these affidavits were sent to the experiment station at Lexington before these bulletins that have been used in this case were published?" And he answered, "They were." In another part of his evidence he used the word "application" for license and stated what this paper he called "application" contained, showing that it complied with all the requirements of the statute. His whole evidence shows very clearly, we think, that the witness used the words "application" and "affidavit" interchangeably, and, due to this confusion of terms on the part of the witness, counsel has not, as we think, fairly construed his evidence.

But in addition to this, and fully supporting the view that the affidavits accompanied the samples sent by the chemical company, is the admitted fact that the sample so sent was analyzed by the experiment station, and this analysis it could not have made under the statute unless the samples sent for analysis had been accompanied by the proper and statutory affidavits. The fact

that the chemist of the experiment station, a public officer, made the analysis is presumptive evidence that he had before him in making it all that the statute required him to have.

On behalf of McKinney, C. B. Bethurum, one of the farmers to whom he sold this fertilizer, testified that he bought, in the spring of 1911, about ten sacks. That in the fall of that year he took out of one sack, a part of which he had used, about a half pound of the fertilizer and had it sent in a jar to A. M. Scovell, at the experiment station at Lexington, putting in the jar the label from the sack; that he got a letter from Scovell in which he said there "wasn't any potash in it;" that he did not have the letter; that neither McKinney nor any one representing the chemical company was present when he took the sample from the sack.

D. P. Bethurum testified that he sent the sample for C. B. Bethurum by express to Mr. Scovell, and that C. B. Bethurum received from Mr. Scovell a letter showing the analysis of the sample; that he notified McKinney to be present when the sample was sent.

H. J. McClure testified that C. B. Bethurum gave him the letter received from Scovell but he did not remember its contents and could not find the letter, which was written by Scovell in 1914, according to his best recollection.

John Marler testified that he read the letter from Scovell in which he said the fertilizer was principally "filler," with no potash or phosphorus, and was of little or no value to crops.

McKinney testified that Bethurum had talked to him about sending a sample to have it analyzed, and he agreed to be at Mt. Vernon when it was sent off by express, but was not present when sample was procured, nor had he refused to be present.

William Rodes, who had been the fertilizer chemist at the experiment station for seven years, and during the years 1910 and 1911, testified that the experiment station kept a record of all fertilizers sent to it for analysis, and that a careful examination of the books and records of the experiment station failed to disclose that any analysis of fertilizer was made for Bethurum in 1910 or 1911, or subsequent thereto, or any letter written by Mr. Scovell concerning such analysis, al-

though it was the custom of the station to keep copies of all such letters.

We do not think this evidence relating how the fertilizer was sent by Bethurum for analysis, shows a substantial compliance with subsection 8 of the statute heretofore quoted; but, aside from this, the evidence concerning the contents of the letter received from Mr. Scovell, who was admittedly the head of the experiment station at the time, is very indefinite and unsatisfactory, and, besides, its probative value is so greatly diminished, if not entirely overcome, by the fact that there was no mention of sample or letter on the records of the experiment station, that we do not think this evidence was of itself sufficient to establish that the fertilizer did not correspond with the analysis on the label.

The purpose of allowing purchasers of fertilizer to secure samples and have them analyzed, is a very useful one, as it enables the farmer, free of cost, to obtain a direct analysis of the fertilizer that he purchases, so that he may know independent of the manufacturer's label that the fertilizer contains the ingredients represented by the manufacturer. This valuable statute should be liberally construed to carry out its purpose to protect farmers, but in view of the fact that if an analysis of a sample sent by the farmer shows the fertilizer to be deficient in the guaranteed percentage of essential ingredients, it would subject the manufacturer to heavy penalties and defeat his right to recover the purchase price of the fertilizer, we think there should be at least a substantial compliance with the statute before evidence relating to the sample is admissible to overcome the integrity of the label attached to the package.

We now turn to the evidence on the subject of the alleged worthless character of this fertilizer as shown by the testimony of the farmers who used it without getting any benefit. It was upon this evidence, as we think, that the jury found their verdict against the chemical company, because in the only instruction given to the jury by the court he told them that they should find for the chemical company "unless you shall believe from the evidence that the fertilizer sold to the consumers who executed the notes mentioned in this connection, the payment of which was guaranteed by the defendant, was worthless and of no value, and if you shall so believe, you will find for the defendant." It will be

noticed that the trial judge put the case to the jury upon the single issue of the worthlessness or value of the fertilizer, and this instruction, we suppose, was based upon the evidence of four farmers, who said, in substance, that they purchased from McKinney fertilizer that McKinney procured from the chemical company, and used it on various crops, to the growth of which the fertilizer was supposed to be adapted, without deriving any beneficial results from its use or, as some of them expressed it, "they did not get any results from the use of the fertilizer."

It may also be here said that the chemical company made and saved proper objections and exceptions to all this evidence and did not offer any evidence of farmers or other persons as to results that had been obtained from the use of the fertilizer, because the contention of counsel for the chemical company was and is that all evidence of this character was incompetent; and if this is so, there was no evidence in the case upon which to rest the instruction given by the court.

The question now presented is, was the evidence of the farmers competent for the purpose of defeating the claim sued on by showing that the fertilizer was worthless or that they did not get any beneficial results from its use?

In support of the competency of this evidence counsel for McKinney rely on the case of Hardy Packing Co. v. Sprigg, 27 Ky. L. R. 133. In that case, as in this, suit was brought by the Hardy Packing Co., a manufacturer of farm fertilizers, against Sprigg, its agent, under a contract similar to the one made by McKinney. The defense of Sprigg, like that of McKinney, was that the fertilizer was worthless. In support of this defense, Sprigg introduced, over the objection of the packing company, the evidence of a number of farmers who had purchased the fertilizer from Sprigg, to the effect that the fertilizer was worthless. The court held that the evidence of these farmers was competent, and in answer to the argument of counsel for the Hardy Packing Co., that the analysis of the fertilizer made by the experiment station was the best and only competent evidence of its quality, said: "Even if the statute should be construed to have the effect as contended for, which we do not decide, the appellant did not prepare its pleadings to get the benefit of this statute. It was not alleged

that it complied with the provisions of this statute in any particular.  It did not even allege that the fertilizer furnished appellee for sale was labeled with the analysis as made by the director of the agricultural experiment station, and if so labeled, that the fertilizer furnished was of the kind or grade as the samples furnished by it to the director for analysis.''

It is very clear from this opinion that the court was influenced to hold this evidence competent because the Hardy Packing Co. had not pleaded or relied on the statute that is particularly pleaded and relied on by the chemical company in this case, as is shown by the pleading heretofore set out.  On this subject our opinion is that when the pleading of the fertilizer company sets up a compliance with the statute, and its evidence, if the matter is put in issue, sustains the pleading, it is not permissible as a defense to the action to show by persons using the fertilizer that they did not get good or any results from its use.  If the fertilizer does contain the percentage of essential ingredients shown in the label, then the purchaser should not be allowed to defeat a suit for the recovery of the purchase price by showing that he did not get good or any results from its use.

The fertilizer company is only required to furnish that character and quality of fertilizer described in the analysis made by the experiment station and set out in the labels attached to the packages it offers for sale. When it has done this, it has complied with every obligation imposed upon it in regard to the character or quality of the fertilizer.  The observance of these statutory requirements takes the place of the ordinary express or implied guaranty.  There is no implied guaranty on its part that the fertilizer will be beneficial in the cultivation of any crop in connection with which it may be used.  In other words, its whole guaranty is contained in its label.  Independent of its label, there is no express or implied guaranty.  It says to the farmer or purchaser: ''Here is my fertilizer and here is the label attached to it setting out specifically and accurately the ingredients and per cent. of each it contains, and I guarantee that it does contain these ingredients and the per cent. of each specified.  You must be the judge whether you want to buy it or not.  It is with you to decide whether it will be beneficial to your land

or your crops. If it proves not to be helpful, I am not responsible for that result.''

Common experience teaches that crop failures may be due to so many different causes that it is rather speculative to attempt to describe the particular cause that produced the failure. It may be due to inherent conditions in the soil, or to continued drought, or to excessive rain, or to imperfect cultivation, or to inferior seed, and in addition to these problematical causes when fertilizer is used, the failure to get results from its use may be due to the inadaptability of the quality of the fertilizer to the land on which it is used or the crop to which it is applied. As illustrating this, Rodes, the fertilizer chemist of the state experiment station, said, in answer to the questions: ''Q. Tell whether or not it is possible to tell the percentage of the different ingredients of fertilizers by crop results? A. No, sir. You can't do that. Q. What is the proper way and the only way to tell the analysis of fertilizers? A. By chemical analysis. Q. And the crop test is not a true test? A. It is a test in a way. A crop of course will show the results of the fertilizer, the application of the fertilizer, but the composition can only be told from chemical analysis. Q. Is the crop result uniform under different conditions. A. No, sir.''

P. E. Karraker, connected with the agricultural experiment station, and who testified that he had had long experience as a special investigator of soils, said that you could not tell the percentage of the ingredients in a fertilizer by the crop results.

But of course when the fertilizer company has not complied with the statute, it thereby becomes liable on its implied or express guaranty, as the case may be, and it is permissible to show the breach of the guaranty by the crop failure, because this is the best evidence obtainable, however speculative and problematical it may be. But when the manufacturer has complied with the statute, then the best evidence as to the quality of the fertilizer is the label and not the crop results, and if the fertilier corresponds with the label and the label was authorized by the experiment station, the farmer cannot defeat the collection of the purchase price by showing that he derived no benefit from its use.

Cases supporting the rule that the evidence of farmers such as was offered in this case is not competent,

and that the manufacturer of fertilizers is bound solely by the percentage and quality of the ingredients as described in the labels attached to the fertilizer, are: Scott v. McDonald, 83 Ga. 28; Armour Fertilizer Works v. McLawhorn, 158 N. C. 274; Walker v. Pue, 57 Md. 155; Mason v. Chappell, 15 Gratton (Va.) 572; Philbrick v. Kendall, 111 Me. 198; Bell v. Reynolds & Lee, 78 Ala. 511; Kimbro v. Bradshaw, 68 Fla. 12; Gardner v. Winter, 117 Ky. 382.

The farmer, however, is not without his remedy if fraud or imposition is practiced upon him by the manufacturer, or if the fertilizer does not contain the full percentage of essential ingredients specified in the labels. He can have the fertilizer analyzed, free of cost, in the manner pointed out in section 1822 of the Kentucky Statutes, and if the sample is submitted to the experiment station in substantial conformity to the requirements of the statute, and the analysis by the experiment station shows that the fertilizer contains a less percentage of essential ingredients than the description contained in the label, he can rely on this fact alone as a defense and it will defeat a recovery in a suit against him to collect the price of the fertilizer; and so can the agent of the fertilizer company, such as McKinney was, rely on this defense to avoid his guaranty.

Wherefore, the judgment is reversed, with directions for a new trial in conformity with this opinion, and if there be another trial and the evidence is substantially the same as appears in this record, the court will take the case from the jury.