# Bloemer et al. v. Turner et al.

Dec. 5, 1939.

William Marshall Bullitt, Leo T. Wolford and Bruce & Bullitt for appellants.

Job. D. Turner, Jr. and Hubert Meredith, Attorney General, for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The case presents a question of statutory construction with respect to the authority of an administrative bureau. It relates to labels on canned dog food. It is a representative suit by a distributor and manufacturer of such commodity against the Director of the Kentucky Agriculture Experiment Station and the Head of the Department of Feeding Stuffs of that Station, seeking a declaration of rights and injunctive relief. The circuit court upheld the authority of the administrative officers and its exercise.

No claim is made that canned dog food is not within the terms of Section 1719a-1 et seq. of the Statutes, which regulate the manufacture and sale of "concentrated commercial feeding stuff." The statute is administered by the Director of the Kentucky Agriculture Experiment Station, which is a part of the College of Agriculture of the University of Kentucky. Section 4636f-1 et seq., Statutes. The Act (Chapter 48, Acts of 1906) defines the term to include certain specified articles of food for domestic animals, requires inspection and analysis, provides for branding and labeling, and imposes civil liability as well as a criminal penalty for its violation. In many respects the statute is vague

and ambiguous. Section 1 of the Act, Section 1719a-1, Statutes, sets out the requirements as to labeling or tagging the containers of such feeding stuff. So much of that section as bears on the question before us may be thus abridged:

Every container shall bear a tag or label on which is shown (1) the number of net pounds therein; (2) the name, brand or trade-mark; (3) the name and address of the manufacturer; (4) "and the guaranteed analysis, stating the percentage of fat and the percentage of protein, allowing one percentum (1%) of nitrogen to equal six, twenty hundred percentum (20.-100%) of protein, these constituents to be determined by the methods adopted by the Association of Official Chemists of the United States;" and (5) the ingredients from which the feed is compounded. The package must also bear a stamp showing payment of the inspection fee. Section 13 of the Act, Section 1719a-13, Statutes, provides:

"The director of said experiment station is empowered to adopt standards for concentrated commercial feeding stuffs and to make and enforce such rules and regulations as he may deem necessary to carry fully into effect the true intent and meaning of this act."

There has been a phenomenal development of this new industry of preparing and marketing food for dogs in cans. It is principally made of the by-products or offal of meat packing and the fishing industry, with cereals added. It is declared by the chemists and others who testified to be nutritious, clean and wholesome, but the Director seriously questions this. The record indicates that the manufacturers and distributors have cooperated and worked in harmony with the Agriculture Experiment Station, there being unquestionably a need for regulation and an advantage to be derived from having the product bear the approval of the Station with its consequent guarantee. As counsel expresses it, they seek "not to destroy but to fulfill" the law. However, a disagreement arose over the order of Dean Thomas Cooper, the Director, and his representative, J. D. Turner, the Head of the Department of Feeding Stuffs, that there be printed on the label of each can the statement that it contained, "Water, maximum 74%." The director had promulgated a document styled, "Stand-

ards, Rules and Regulations for Dog Feed," which required that all cans should contain protein, minimum 10%; fat, minimum 2%; fiber, maximum 1.5%; water, maximum 74%.

Later the Department sent out a circular letter to manufacturers and distributors requiring that for the purpose of registration such dog food should be guaranteed as to the maximum percentage of water; that water be declared as one of the ingredients; and that the labels on the cans should contain essentially the information guaranteed by the registration. The industry sought to have him withdraw that part of the order requiring that the labels should state the water content. They did not object to the fixing of a maximum or to the maximum so fixed. They objected only to printing the statement on the labels that the can contained 74% water because it would be misleading since (a) the principal water content is the natural moisture of the ingredients of meat and vegetables, with only a small amount of water added for cooking and processing; and (b) a false impression would be given the trade that the dog food actually contains 74% of added water, whereas it is a spongy mass, substantially solid, and contains no free liquid. There would be, the appellants maintain, an immovable sales resistance. It is pointed out in the evidence by way of illustration that a label on a bottle of milk that it contains 90% water would be ruinous to the dairymen, even though such be a fact. There are other detriments and disadvantages claimed. The Director refused to recede from his position, justifying his action upon deception of the public as to the nutrition in and actual worth of the product. He states there has been adulteration and much water added by some manufacturers, and claims gross exaggeration of merit in the product. Official notice was given that prosecutions under the penal provision of the statute would be instituted against those who failed to show the maximum water content on the labels. This suit followed.

The basis of the objection by manufacturers and distributors and the justification by the Director have little to do with the decision of the legal question involved, since the plaintiffs do not rely upon the ground of an arbitrary abuse of official discretion. They chal-

lenge only the authority of the Director to require that the labels on the cans bear the statement, ''Water, maximum 74%.'' Appellants argue that the statute cannot be rightly and fairly construed to give the Director such power; that such a construction would make the act invalid as an unconstitutional delegation of legislative power. The due process clauses of the Federal Constitution, U. S. C. A. Constitution Amendments 5, 14, are invoked because the statute provides for no hearing before the Director or appeal to the courts.

First, it is to be noted that though Section 1 of the Act provides that each package of ''concentrated * * * feeding stuff'' shall have printed on the label or tag the ''ingredients from which it is compounded,'' it does not provide that the proportion of each ingredient shall be stated. The requirement of percentages is only as to fat and protein, that is, certain elements of food value of the entire product—the nutritious substance of all the compounded ingredients as measured by the terms ''fat'' and ''protein.'' For selling feeding stuff containing smaller percentages of fat and protein than the minimum or larger percentages of crude fiber than the maximum guaranteed, and for adulteration with foreign substances of certain kinds having little or no food value, a criminal penalty is provided. Section 1719a-9, Statutes. For misrepresenting on the label a larger percentage of protein or fat than the product actually contains, both criminal and civil liability are imposed. Section 1719a-10, Statutes. It is the proportion of these essential qualities that the statute requires shall be disclosed to the purchaser. The proportionate quantities of ingredients are not required to be disclosed though what those ingredients are must be. In this respect the statute is different from Section 1822-1 et seq., Statutes, regulating fertilizers, after which this act was apparently patterned. Cf. American Agriculture Chemical Company v. McKinney, 173 Ky. 820, 191 S. W. 647. By specifying the publication only of the percentages of the nutritious quality of the whole and by confining the imposition of penalties to that the legislature manifested the intent not co require other percentages to be stated on the label. Logic and experience developed to maxim expressio unius est exclusio alterius,—''The enumeration of particular things ex-

cludes the idea of something else not mentioned." This is a primary rule of statutory construction. Hughes v. Wallace, Ky., 118 S. W. 324; 25 R. C. L. 982.

The meritorious purpose of the statute to protect the purchasers of stock feed from imposition and the stock from deleterious feed is clear. The good faith and conscientious endeavors of the Director of the Agriculture Experiment Station and the Head of this Department to carry out that purpose are not questioned. The issue is whether the act is to be so construed as to give the right or impose the duty on the Director to prescribe the objectionable publication. That is claimed under the general grant of authority contained in Section 13 of the Act (Section 1719a-13, Statutes), "to make and enforce such rules and regulations as he may deem necessary to carry fully into effect the true intent and meaning of this act."

The trend of the last two or three decades toward paternalistic control and regulation of commercial transactions, nurtured by increasing complexity of life and business, has raised serious and difficult questions of delegation of governmental power to administrative agencies. As recently observed, "Administrative boards and commissions have undoubtedly become an essential part of our governmental structure. That there are both advantages and disadvantages inherent in the system is admitted." Keller v. Kentucky Alcoholic Beverage Control Board, 279 Ky. 272, 130 S. W. (2d) 821, 824. But neither wisdom of policy nor demands of expediency, nor both, should be allowed to lead the courts away from basic constitutional processes, or sound judicial construction of statutory authority. There is danger in a departure from the fundamental doctrine that "Ours is a government of laws and not of men." This concept is clearly expressed in the Constitution of Kentucky. The legislative power is "confined to a separate body of magistracy," namely, the "General Assembly of the Commonwealth of Kentucky." Section 27, 29, Kentucky Constitution. Accentuating this cardinal principle of our republican form of government, with its general limitations of power in those who may be chosen to govern, is Section 60 of the Kentucky Constitution that (excepting referenda on certain specified public questions), "No law * * * shall be enacted to take

effect upon the approval of any other authority than the general assembly, unless otherwise expressly provided in this Constitution.'' We have held ineffective or void several statutes dependent upon the contingent action of a group of individuals. Owensboro & N. Railroad Company v. Todd, Ohio & M. Ry. Co. v. Todd, 91 Ky. 175, 15 S. W. 56, 12 Ky. Law Rep. 726, 11 L. R. A. 285; Columbia Trust Company v. Lincoln Institute, 138 Ky. 804, 129 S. W. 113, 29 L. R. A., N. S., 53; Commonwealth v. Beaver Dam Coal Company, 194 Ky. 34, 237 S. W. 1086, 27 A. L. R. 920; Anderson's Adm'r v. Granville Coal Company, 205 Ky. 111, 265 S. W. 472; Cf. McCown v. Gose, 244 Ky. 402, 51 S. W. (2d) 251. Thus it is made sure that the legislature may not in any degree abdicate its power. If it may not make the effectiveness of a specific act dependent upon the will of another, certainly it may not delegate to another the power to enact a law, whether in form or effect. We do not, of course, have reference to municipalities, for which express provision is made, or to empowering administrative boards to adopt rules and regulations and perfect the details of a plan, the general outlines of which have been laid down in a statute. 6 R. C. L. 179.

The Federal Constitution, though it limits the grant of powers, is not so restrictive of powers granted. It is to be observed that, unlike our own and many other state constitutions, the Federal Constitution merely assigns the legislative power to Congress. U. S. C. A. Constitution, Article 1, Section 1. That instrument contains no provision expressly forbidding the Congress to delegate its legislative powers. Even so, as said in Panama Refining Company v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 248, 79 L. Ed. 446, 447; ''The Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested.'' Because of the flexibility and liberality of the Federal Constitution in this relation, and of the restrictions of our State Constitution, the construction by the United States courts of Acts of Congress vesting or delegating extraordinary powers to administrative boards or executive officers does not have the usual persuasive force of legal precedent in considering the validity and efficacy of Acts of the Kentucky Legislature.

It is an accepted principle that ''the legislative de-

partment has no right to deputize to others the power to perform its governing functions." Kerr v. City of Louisville, 271 Ky. 335, 111 S. W. (2d) 1046, 1052. But, obviously, the legislature cannot deal with subordinate rules or cover the details of administration and execution in its regulatory enactments. Perforce, these must be left to those upon whom the duty of carrying out the legislative will devolves. However, the legislature must lay down policies and establish standards. Keller v. Kentucky Alcoholic Beverage Control Board, supra. It is not easy to discern the demarcation between legislative and administrative functions or between the power to make laws and the power to make regulations within the scope of legitimate delegated authority. In this respect we conceive the true distinction to be as stated in a leading Pennsylvania case, Locke's Appeal, 72 Pa. 491, 13 Am. Rep. 716:

> "The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

In material respects the statute under consideration is clearly valid in setting up standards and empowering the Director of the Agriculture Experiment Station the authority to determine facts or conditions on which it becomes operative and then to apply and execute the law. The general principles which we have discussed must be regarded in weighing the contention of the Director in the one respect stated.

To sustain the validity or soundness of their interpretation of the statute, the appellees rely upon Craig v. O'Rear, 199 Ky. 553, 251 S. W. 828; Estes v. State Highway Commission, 235 Ky. 86, 29 S. W. (2d) 583; Ashland Transfer Company v. State Tax Commission, 247 Ky. 144, 56 S. W. (2d) 691, 87 A. L. R. 534; Spahn v. Stewart, 268 Ky. 97, 103 S. W. (2d) 651; and Kerr v. City of Louisville, supra. These cases construing acts claimed invalid as delegating legislative functions or

powers are distinguishable. They but authorized public agencies to carry on part of the business of the state or of local governments. The Craig case related to the location of State Teachers Colleges; the Estes case to erecting and financing of highway bridges; the Ashland Transfer Company case to the regulation, use and protection of highways; the Spahn and Kerr cases to grants of authority to municipalities for local purposes, and particularly to the matter of making appointment of subordinate officials. These cases held either that no legislative function had been delegated or that what was delegated was within the scope of constitutional powers. We are dealing here with one section of an act regulating legitimate private business and not concerning public business.

Reading the section in isolation, appellees are met with the absence of any sort of standard or guide. No one could claim such vast and unrestricted governmental power as that would import. Reading the section in connection with other parts of the statute, as must be done, the appellees are met with the specific statement of the legislature that the percentages of only the qualities of fat and protein of the products are to be put on the labels. It is another primary rule in construing grants of authority that general terms must yield to the specific. 25 R. C. L. 1010.

The General Assembly deemed it to be legislation to prescribe the contents of the label. It did so itself. We suppose no one would contend that the Director of the Agriculture Experiment Station, or any other agency, could detract from the stipulated provisions, e. g., rule that the net weight of the contents of the package need not be printed on the label. If he may not by regulation subtract, then he may not by regulation add. To construe the act as appellees contend would be to hold that it was the intent of the General Assembly to delegate an attribute of sovereignty to the individual director by authorizing him to alter or amend a law at will.

It is to be noted that the Director construed his regulation to create a criminal offense, for he notified the trade that prosecutions would be instituted for a failure to comply with it. Undoubtedly, it is not within the province of the legislature to delegate to an individual or board the power to create a crime. 6 R. C. L. 182.

The cardinal principle of judicial construction is to save and not to destroy. We, therefore, construe the act as not authorizing the Director of the Agriculture Experiment Station to require the printing on the label of the percentage of water in appellants' product, and that such a regulation was and is in excess of his administrative powers.

The judgment is reversed with directions to enter another consistent with this opinion.

Whole Court sitting; Judge Cammack dissenting.