J. Roy HOLSCLAW and Ronald L. Pinchback, Sr., Appellants,

v.

Robert F. STEPHENS et al., etc., et al., Appellees.

CIVIL SERVICE EMPLOYEES, INC., et al., Cross-Appellants,

v.

J. Roy HOLSCLAW et al., Cross-Appellees.

CIVIL SERVICE EMPLOYEES, INC., et al., Appellants,

v.

J. Roy HOLSCLAW et al., Appellees.

Court of Appeals of Kentucky.

Dec. 28, 1973.

As Modified on Denial of Rehearing April 19, 1974.

---

4. The shirt, if he had one, apparently was not found.

Weldon Shouse, Charles W. Arnold, Lexington, for appellants.

John R. Cook, Jr., Gess, Mattingly, Saunier & Atchison, Leslie W. Morris, II, William C. Jacobs, Lexington, for appellant-intervenors.

Harry B. Miller, Jr., Lexington, for appellants-cross-appellees.

George F. Rabe, Lexington, Ed W. Hancock, Atty. Gen., Frankfort, Cecil F. Dunn, J. Montjoy Trimble, Lexington, for appellees.

E. Lawson King, Frank G. Dickey, Jr., Lexington, for appellees-cross-appellants.

VANCE, Commissioner.

Pursuant to Kentucky Revised Statute 67A.010–67A.040, the citizens of Fayette County, Kentucky, have elected to adopt a plan of merger of all units of city and county government into an urban county form of government.

Various individuals and groups of citizens acting in a representative capacity instituted class actions challenging the validity of the plan of merger and the constitutionality of KRS 67A.010–67A.040, the enabling legislation.

The trial court upheld the plan of merger generally but invalidated certain of its provisions. Those provisions which were invalidated were struck from the plan under a severability clause and the remaining provisions were held to be valid. The separate appeals and cross-appeals from the judgment of the trial court have been consolidated for the purpose of review.

KRS 67A.010, 020, 030 and 040 provide as follows:

"67A.010. *Urban county form of government authorized.*—In order to facilitate the operation of local government, to prevent duplication of services, and to promote efficent and economical management of the affairs of local government, the voters in any county except a county containing a city of the first class may merge all units of city and county

government into an urban county form of government. Such merger shall take place only after compliance with the procedures set forth in KRS 67A.020.

"67A.020. *Election on urban county form of government—Formation of plan.* —Upon a petition filed with the county clerk and signed by a number of registered voters equal to 5 per cent of voters of the county voting in the immediate past general election, and, upon additional petitions equal to the number of municipal corporations within the county, filed with the county clerk and signed by a number of registered voters equal to 5 per cent of the number of voters of each municipal corporation, voting in the immediate past general election, requesting a referendum to be held on the question of adopting the urban county form of government, the fiscal court and the council of the largest city within the county shall appoint a representative commission composed of not less than twenty (20) citizens which shall devise a comprehensive plan of urban county government. The plan shall include a description of the form, structure, functions, powers and officers and their duties of the proposed urban county government; the procedures by which the original plan may be amended; and such other provisions as the commission shall determine; and shall be consistent with the provisions of the constitution of Kentucky. This plan shall be advertised at least ninety (90) days before a general election at which the voters will be asked to approve or disapprove the adoption of the plan. The ballots shall be counted, returns made and canvassed as in other elections, and the results shall be certified by the county board of election commissioners to the county clerk. If it appears that a majority of those voting are in favor of adopting the plan, the commissioners shall enter such fact of record and shall organize the urban county government.

"67A.030. *Effective date of urban county form of government—Assumption of all governmental functions by county.*—Upon the election and qualification of county officers and such other elected officials as provided in the comprehensive plan at the next regularly scheduled election at which county officers shall be elected, as provided in section 99 of the constitution, the urban county government shall immediately become the effective government. All the debts, property, franchises and rights of the existing county government and of any municipality within the county shall be assumed by the urban county government.

"67A.040. *General powers of urban county.*—All powers and privileges possessed by the county and by the class of cities to which the largest city in the county belongs on the date the urban county government becomes the effective government shall be exercised by the urban county government."

Upon petition by the required number of voters of Fayette County a commission was appointed to devise a comprehensive plan of urban county government. The plan submitted by the commission and approved by the electorate comprises a Charter for local government which is unique in this state. It is divided into sixteen Articles which may be summarized briefly as follows:

Article 1. Article 1 merges the governmental and corporate functions of the City of Lexington[1] with the governmental and corporate functions of Fayette County to form a single government to replace and supersede the governments of the City of Lexington and Fayette County. The entire geographic area of Fayette County is established as the territorial jurisdiction of the new government.

Article 2. Article 2 provides that the territory of the merged government shall be divided into a general services district, a

---

[1]. The City of Lexington is the only incorporated city in Fayette County.

full urban services district, and such partial urban services districts as the council shall from time to time create. Each service district also constitutes a separate tax district for the levy and collection of taxes in accordance with the kind, type, level, and character of the services provided in that service district.

Article 3. Article 3 designates the powers of the merged government as being all powers which counties and cities of the second class are presently, or hereafter may be, authorized to exercise, including but not limited to the power to:

1. Levy and collect taxes.

2. License and regulate trades and occupations.

3. Make appropriations.

4. Borrow money.

5. Own and maintain property.

6. Exercise eminent domain.

7. Provide for and regulate use of roadways.

8. Own and operate public facilities.

9. Own and maintain parks and recreation facilities.

10. Provide facilities for detention and confinement.

11. Establish and maintain hospitals.

12. Establish and maintain libraries.

13. Enact and enforce ordinances.

14. Regulate weights and measures.

15. Establish and enforce building codes.

16. Grant franchises.

17. Regulate traffic.

18. Collect and dispose of garbage.

19. Prevent pollution.

20. Provide for urban renewal.

21. Establish zoning.

22. Prevent cruelty to children and animals.

23. Operate police and fire departments.

24. Create necessary boards and agencies.

25. Enter into contracts.

Article 4. Article 4 establishes as the legislative authority of the merged government a "council" consisting of fifteen members, three elected at large and the other twelve being elected from single-member districts which districts are specifically designated. All legislative powers and other specific powers are vested in the council. The Article fixes the terms of office, the times and nature of elections, qualifications, and compensation of council members, and procedures for filling vacancies. It provides for an independent audit and for a citizens' advocate. It provides that the county clerk shall be responsible for the keeping of all council records and perform such other duties as the council may from time to time designate.

Article 5. Article 5 provides for the allocation of all executive and administrative power of the merged government and provides for the election, term of office, qualifications, compensation, power and authority of the chief executive of the merged government to be known as a mayor. The mayor is given veto powers. Provision is made for filling vacancies and for a chief administrative officer.

Article 6. Article 6 provides for an office of administrative services and for seven executive departments with various divisions, functions and duties. This Article further provides that the council shall have the power to consolidate, divide and otherwise restructure the organization of all departments, offices and divisions by ordinance passed by a three-fifths' vote of the council.

Article 7. Article 7 provides for the termination of five existing boards and agencies of the county and city government,

provides that other boards, agencies and commissions of the present government shall continue for a period of ninety days, and provides that the Lexington Civil Service Commission and the Lexington Civil Service Examining Board shall be combined to form the Civil Service Commission of the merged government. This Article also provides that the Lexington Employees Pension Fund Board and the Lexington Police and Firemen's Pension Fund Board shall continue with their names changed to substitute the word "merged government" for Lexington and provides for certain changed powers and limitations in membership. The county budget commission is substantially stripped of its duties.

Article 8. Article 8 deals with the budget, levy of taxes and other financial matters.

Article 9. Article 9 provides for a classified civil service plan and employee pension and retirement plans.

Article 10. Article 10 provides that the Urban County Courts shall consist of a Quarterly Court, a County Court and three Justices Courts. The Municipal Court of the City of Lexington is terminated thirty days after the effective date of the Charter. The county judge is designated as the judge of the Quarterly Court and the County Court and as the Administrator of all Urban County Courts.

Article 11. Article 11 deals with the functions of the county judge, fiscal court, county court clerk, county attorney, sheriff, property evaluation administrator and other county officers. The fiscal court is stripped of most of its statutory duties and responsibilities and its members shall serve without pay.

Article 12. Article 12 provides for the conduct of elections.

Article 13. Article 13 maintains the present status of the Fayette County School District, the Fayette County School Board, the Fayette County Public School System and certain water districts.

Article 14. Article 14 sets out the procedure for revision and amendment of the Charter and provides that any amendment which has the effect of abolishing the merged government shall become effective only at such time as the General Assembly of Kentucky has established a successor government to replace and supersede the government established by the Charter.

Article 15. Article 15 fixes the time for the submission of the Charter to the voters for approval, the time for the election of the mayor and council, and the effective date of the Charter.

Article 16. Article 16 provides for a code of ethics including provisions as to conflicts of interest and disclosure by officers and employees of the merged government. A Board of Ethics is established and penalties are prescribed for violations.

Before we commence to review specific objections to the validity of the plan of merger, it is appropriate to discuss some basic principles which are applicable to the consideration of this case.

Section 27 of the Kentucky Constitution divides the powers of government of the Commonwealth of Kentucky into three distinct departments, the Executive, the Legislative and the Judicial. Section 29 provides that the legislative power shall be vested in the General Assembly.

■ Our State Constitution is a limitation upon the exercise of power rather than a grant of any specific power to the legislature. The legislature may enact any law which is not expressly or impliedly prohibited by the Constitution of the United States or the Constitution of Kentucky. Dalton v. State Property and Buildings Commission, Ky., 304 S.W.2d 342 (1957); City of Louisville Municipal Housing Commission v. Public Housing Administration, Ky., 261 S.W.2d 286 (1953); McCreary v. Field, 148 Ky. 730, 147 S.W. 901 (1912).

It is not within the province of the courts to pass upon the wisdom of legislation. Dalton v. State Property and Buildings Commission, supra; Sims v. Board of Education of Jefferson County, Kentucky, Ky., 290 S.W.2d 491 (1956); Kentucky Tax Commission v. Lincoln Bank & Trust Co., Ky., 245 S.W.2d 950 (1952); Tipton v. Tipton, 309 Ky. 338, 217 S.W.2d 799 (1949).

Consequently we limit our review to the validity and constitutionality of the merger plan and express no opinion whatever as to its wisdom, a matter which is solely the responsibility of the General Assembly which authorized it.

In contrast with the wide scope of authority of the General Assembly, the political subdivisions of the Commonwealth are creations of the General Assembly and possess only those powers which have been granted to them expressly plus those powers necessarily implied or incident to expressly granted powers as to enable them to carry out the expressed powers. City of Horse Cave v. Pierce, Ky., 437 S.W.2d 185 (1969); Board of Trustees of P. & F. R. F. v. City of Paducah, Kentucky, Ky., 333 S.W.2d 515 (1960); Farris v. Nichols, 286 Ky. 196, 150 S.W.2d 484 (1941); Griffin v. City of Paducah, Kentucky, Ky., 382 S.W.2d 402 (1964).

We find nothing in the Constitution which requires that subdivisions of local government be limited to cities and counties.

The first Constitution of Kentucky (1792), recognized the existence of the counties enumerated in the compact with Virginia (1789), and each successive Constitution has recognized counties as political subdivisions of the Commonwealth. Section 156 of the Constitution provides that cities shall be classified in six classes and thus recognizes cities as political subdivisions.

We have heretofore approved the establishment of municipal improvement districts and sewer districts and have recognized them as forms of municipal corporations. Lowery v. County of Jefferson, Ky., 458 S.W.2d 168 (1970); Fawbush v. Louisville & Jefferson County Metropolitan Sewer District, Ky., 240 S.W.2d 622 (1951); Rash v. Louisville & Jefferson County Metropolitan Sewer District, 309 Ky. 442, 217 S.W.2d 232 (1949). Our statutes authorize a great variety of other districts such as water districts, fire prevention districts, and library districts. We see no reason why the General Assembly may not establish a new unit of local government in which are combined the powers of both city and county governments. There can be no doubt that the statute authorizing the merger of all units of city and county government into an urban county government is an attempt to do just that. This new form of government is neither a city government nor a county government as those forms of government presently exist but it is an entirely new creature in which are combined all of the powers of a county government and all of the powers possessed by that class of cities to which the largest city in the county belongs.

Although the General Assembly has authorized a new form of government, the particular form in question was not specified by the General Assembly but was devised by the merger commission and ratified by the voters of Fayette County. This raises a question as to the constitutionality of the delegation of legislative power.

Appellees take the position, as did the trial court, that this issue was disposed of in Pinchback v. Stephens, Ky., 484 S.W.2d 327 (1972), a declaratory judgment action filed to test the constitutionality of KRS 67A.010–040 which was decided before the adoption of the plan of merger by the citizens of Fayette County.

In *Pinchback* consideration was necessarily limited to the wording of the statute because no plan of merger had then been devised. In effect we held the statute was

not unconstitutional simply because a plan formulated under it might in some way affect the structure of local government.

The opinion in *Pinchback* makes plain the fact that the statute was upheld because this court could not say that every possible action taken under it would inevitably violate the Constitution. Whether the General Assembly could constitutionally delegate the authority to draft and adopt a Charter as broad as the one in question remains to be determined.

█ The legislature cannot delegate its power to make a law but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. Bloemer v. Turner, 281 Ky. 832, 137 S.W.2d 387 (1939).

█ It must not be overlooked that legislatures in Kentucky are not in continuous session and of necessity they cannot undertake to determine all facts incident to the administration of the laws which they enact. Therefore when we say that the legislature may not delegate its powers, we mean that it may not delegate the exercise of its discretion as to what the law shall be, but not that it may not confer discretion in the administration of the law itself. Craig v. O'Rear, 199 Ky. 553, 251 S.W. 828 (1923). Generally speaking a delegation of discretion is not unlawful if sufficient standards controlling the exercise of that discretion are found in the act and Butler v. United Cerebral Palsy of Northern Kentucky, Inc., Ky., 352 S.W.2d 203 (1961), discloses other relevant considerations concerning delegation of legislative authority such as procedural safeguards and the right of the delegating authority to withdraw the delegation.

The opponents of the plan of merger contend the plan in question creates new offices in Fayette County, new officers, changes the terms of office and the duties of officers, changes the method of election, gives the mayor veto powers and in a great variety of ways changes the structure of local government. These changes were not ordained by a law enacted by the General Assembly but sprang from the fertile imagination of the merger commission. It is contended that the General Assembly was without power to so delegate its legislative authority.

KRS 67A.010–040 authorized an urban county government and established what powers it should have, i.e., the powers of a county government and powers belonging to that class of cities to which the largest city in the county belonged. The question is whether the limitations upon the power of urban county government contained in KRS 67A.040 constitute sufficient standards or safeguards within the framework of which the merger commission may in its discretion devise a structure of government to exercise those powers or whether the structure of local government itself is a matter of legislative discretion which cannot be delegated. Are the provisions of the Charter which establish the governmental structure of urban county government, including the type of executive and legislative departments it shall have, a law in themselves or do they merely constitute administrative procedures and machinery for the administration of a law?

The question posed is difficult but the majority of the court is of the opinion that the authorization of urban county government and the establishment of its powers was a legislative enactment within the sole discretion of the General Assembly. No authority was, or could be, delegated to increase or diminish its power or responsibility.

█ The majority feel that the structure of urban county government is nothing more than the machinery by which those powers and responsibilities may be executed and therefore the authority to provide the structure can be delegated. The fact that the structure adopted in Fayette County differs from that of other counties does not invalidate the Charter.

Another matter to be considered generally is the principle of uniform applicability of laws. The constitutional debates indicate without question an intention that political subdivisions of every classification shall be governed by uniform laws applicable to all units of the class. Section 156 of the Constitution provides for the division of cities into classes with the organization and powers of each class to be defined by general law so that all municipal corporations of each class shall possess the same powers and be subject to the same restrictions.

Section 59 Subsection 29 of the Constitution provides that where a general law can be made applicable no special law shall be enacted. Section 60 provides that the General Assembly shall not indirectly enact a special or local act by the repeal in part of a general act, or by exempting from the operation of a general act any city, town, district or county.

KRS 67A.010–040 is a general act, not special, in that it applies generally to all counties except those which contain a city of the first class. At the present time it is applicable to one-hundred and nineteen counties.

■ But since each of the one-hundred and nineteen counties is free to organize the structure of its local government, the possibility exists for one-hundred and nineteen different structural organizations administering the powers of local government. The spectre of one-hundred and nineteen different types of local governmental structure can comport with the idea of uniformity only if we recognize that urban county government is a separate classification of local government which is in itself a reasonable classification. We think such a classification is reasonable.

In the days when population was sparse and broadly scattered the chief local need was for local administration of laws enacted by the General Assembly. This local administration could be provided effectively by a county government substantially without legislative power.

As centers of population grew, there developed local community needs for specialized services not county-wide in nature and of such diversity that the General Assembly could scarcely anticipate and provide for them all. Thus the need for municipalities as separate units of government to provide for special needs and services within their own territorial jurisdictions, with power to levy taxes to pay for those needs, and with legislative powers not deemed necessary for the operation of a county government.

With continued growth and concentration of population the need for local power to provide for special services has become a need common to most of the population in some counties yet the necessity to retain a county government in addition to the municipal government has caused a needless duplication of governmental structure in many areas.

For this reason we think a new classification of local government having both county and municipal powers is a reasonable and valid classification based upon a bona fide need which now exists but which was not contemplated in the days when the Constitution was drafted. Nothing in the record before us suggests an attempt by the General Assembly to escape or avoid constitutional limitations applicable to city and county governments by the expedient of calling them by another name. If such were the case the act would amount to no more than a subterfuge and we would not hesitate to strike it down.

To say that the concept of urban county government may be a reasonable and valid classification is one thing. To say that the legislature has in fact created such a classification by implication when it has not done so expressly is quite another thing. We do not find in the statute any language which expressly says that urban county government shall constitute a new and separate classification of local government.

Neither do we find any expression within the act that counties which adopt urban county government are exempt, as a class, from the laws which apply generally to all counties and to cities of each particular class.

In Folks v. Barren County, 313 Ky. 515, 232 S.W.2d 1010 (1950), we said:

"However, the regard for legislative power, with the consequent reluctance of the judiciary to interfere, requires that the court draw all inferences and implications from the act as a whole and thereby, if possible, sustain the validity of the act and expound it. * * *. It is especially right and proper for the courts to do this where the statute is but a broad delegation of power and prescribes only in general terms a rule of action for the officers charged with its execution.

" * * *. 'It is a rule not less of reason than of law that where the end is expressly given, the means necessary to the effectuation of that end are given by implication.' "

Our difficulty however is not with the statute but with the plan of merger adopted. In Pinchback v. Stephens, supra, we alluded to the possibility that a plan of urban county government could be drafted which would not run afoul of the Constitution and it likewise seems possible that a plan could have been devised, the validity of which could be upheld without reading into the statute by implication the meaning which we are now considering. But the particular plan adopted by Fayette County cannot be sustained absent the implication that the legislature intended to create urban county government as a separate classification and exempt all counties which adopt it as a class from the operation of all general laws applicable to county government and city government except those laws which grant powers to city and county government.

It is a cardinal rule of statutory construction that the chief purpose is to determine the legislative intent. In Davis v. Commonwealth Life Insurance Company, Ky., 284 S.W.2d 809 (1955), we said:

"* * * It is elementary that in the construction of a statute the touchstone is the will or intent of the legislature. But that state of mind must be expressed or reasonably implied in the language used. What is not said may be of as much significance as what is said. * * *."

In Gateway Construction Company v. Wallbaum, Ky., 356 S.W.2d 247 (1962), we said:

"* * * To interpret a statute, the common rule is to ascertain and determine the legislative intent. Hopkins v. Dickens, 188 Ky. 368, 222 S.W. 101. It should be pointed out, however that legislative intent is at best a nebulous will-o'-the-wisp. Far better it is to be guided by the old adage, 'Plain words are easiest understood.'

"The best way in most cases to ascertain such intent or to determine the meaning of a statute is to look to the language used, but no intention must be read into the statute not justified by the language. Bohannon v. City of Louisville, 193 Ky. 276, 235 S.W. 750. The primary rule is to ascertain the intention from the words employed in enacting the statute and not to guess what the Legislature may have intended but did not express. * * *."

Nevertheless in Black v. Sutton, 301 Ky. 247, 191 S.W.2d 407 (1945), this court held that a statute which literally abolished all non-elective offices in cities of the second and third class having a commission form of government did not have the effect of abolishing the office of city attorney and in City of Frankfort v. Triplett, Ky., 365 S.W.2d 328 (1963), we held that a statute with identical provisions did not abolish the office of clerk of the police court upon the ground that such a result was not intended by the legislature.

In *Triplett* this court said:

"Myopic exactitude in the construction of statutes would produce many an unfortunate and unintended result. * * *."

■ Although it may have been possible to draft a plan of urban county government which did not require its exemption as a class from general laws pertaining to cities and counties, a majority of this court feels that such a plan would of necessity be so circumscribed in its operation by the general laws as to cripple it and render it unworkable as a practical matter. Thus the majority of the court holds that in enacting KRS 67A.010–67A.040 it was the intent of the legislature to create urban county government as a separate classification of government and to exempt it as a class from the operation of general laws relating to city government and county government except those general laws which confer powers upon city and county governments. ·

■ The plan of merger substantially strips the fiscal court of Fayette County of its powers of fiscal management. This will exempt Fayette County from the operation of a general law prescribing the duties of the fiscal court and thus violate the uniformity provisions of Section 60 of the Constitution except for the saving feature that it is not Fayette County alone which is so exempt but all counties which adopt urban county government are exempt as a class from the statutory provisions which establish the duties of fiscal courts.

■ Although the fiscal court cannot be abolished because to do so would run afoul of the express provision of Section 144 of the Constitution, the duties of the fiscal court are established by statute, not the Constitution, and those duties can be limited in application only to those counties as a class which have not adopted urban county government.[2]

■ In counties containing cities of more than one class, the statute expressly provides that the merged government shall possess only the powers possessed by the class of cities to which the largest city in the county belongs. The powers of the smaller classes of cities are abolished in the merged government. Since the merged government is a new government and it possesses all governmental powers the governmental powers of the cities cease to exist. It necessarily follows that the adoption of an urban county form of government extinguishes all city government and all county government, except units and functions of county government established by the Constitution, which theretofore existed in the county.

2. As a general proposition what the legislature can give the legislature can take away. We said however in Johnson v. Commonwealth, 291 Ky. 829, 165 S.W.2d 820 (1942): "In conclusion, we are of opinion that, while the Attorney General possesses all the power and authority appertaining to the office under common law and naturally and traditionally belonging to it, nevertheless the General Assembly may withdraw those powers and assign them to others or may authorize the employment of other counsel for the departments and officers of the state to perform them. This, however, is subject to the limitation that the office may not be stripped of all duties and rights so as to leave it an empty shell, for, obviously, as the legislature cannot abolish the office directly, it cannot do so indirectly by depriving the incumbent of all his substantial prerogatives or by practically preventing him from discharging the substantial things appertaining to the office." Under the plan of merger the fiscal court retains its power to levy the ad valorem tax and such other taxes as may be provided by law for public schools, its powers under KRS 179.420 to advise the Kentucky Department of Highways concerning the construction and maintenance of roads to be funded under the State Rural Secondary Highway Fund and its power to appoint one person to serve along with the county judge and the county attorney on the County Budget Commission. While it must be admitted that the fiscal court is thus stripped of substantially all its powers, the majority of this court feels that the powers retained are sufficient to prevent our holding that the office is reduced to a hollow shell.

The formation of cities as municipal corporations was solely for the purpose of putting into effect a form of municipal government within the territorial jurisdictions of the corporations. The Constitution of Kentucky authorizes the formation of cities but does not require them. With the abolition of all of its governmental powers no reason exists for the continuation of the territorial jurisdiction of a city.

■ Counties are basic subdivisions of the Commonwealth. They too may be abolished by the General Assembly (Section 63 of the Constitution) but in that event the territory comprising the county must be added to an adjoining county or counties. Fayette County has not been abolished. It remains as a geographic entity which shall hereafter be governed locally by urban county government.

With this background discussion let us now proceed to a consideration of the specific challenges to the judgment of the trial court.

■ A frontal assault is made upon the entire Charter with the allegation that the City of Lexington has a population of more than one-hundred thousand and in reality is a city of the first class even though it has not been so officially classified by the General Assembly. KRS 67A.-010–040 does not authorize urban county government in counties containing a city of the first class.

It was stipulated that the federal census of 1970 showed a population for Lexington in excess of one-hundred thousand. Section 156 of the Constitution provides that cities having a population in excess of one-hundred thousand shall be classified as cities of the first class and it further provides:

"The General Assembly shall assign the cities and towns of the Commonwealth to the classes to which they respectively belong, and change assignments made as the population of said cities and towns may increase or decrease and in the absence of other satisfactory information as to their population, shall be governed by the last preceding federal census in so doing; but no city or town shall be transferred from one class to another, except in pursuance of a law previously enacted and providing therefor."

In Green v. Commonwealth, 95 Ky. 233, 24 S.W. 610 (1894), it was held that the classification of the City of Pineville as a fourth-class city when its population did not justify that classification was not subject to judicial review. We held that the power to classify cities was vested exclusively in the General Assembly by the Constitution. Town of London v. Brown, 183 Ky. 63, 208 S.W. 317 (1919), holds to the same effect.

In Magruder v. Griffith, 274 Ky. 293, 118 S.W.2d 694 (1938), we held that county commissioners in Daviess County were not entitled to be paid at the rate authorized in counties containing a city of the second class although Owensboro at that time had a population in excess of twenty thousand people. The legislature had not transferred it from a city of the third to a city of the second class.

Appellants rely upon Willis v. Jonson 275 Ky. 538, 121 S.W.2d 904 (1938), for the proposition that when classification is based solely upon population the courts may strike down the action of the General Assembly if it clearly appears that the classification was contrary to that authorized by the population. *Willis* involved the redistricting of circuit court districts and the opinion was careful to note the distinction between the sections of the Constitution relating to the formation of judicial districts and the provisions of Section 156 relating to classification of cities.

In addition *Willis* at best could be construed to authorize judicial review of legislative classification only when the legislature has taken some action. It does not

hold that the courts can reclassify a city when the General Assembly has improperly neglected to do so. We held unconstitutional a statute which purported to give circuit courts the right to transfer a city from one classification to another in Jernigan v. City of Madisonville, 102 Ky. 313, 43 S.W. 448 (1897). The Constitution exclusively vests the power to classify cities in the General Assembly and a city cannot be transferred from one classification to another in the absence of legislation to that effect.

It is next contended that KRS 89.-680 provides the only method of terminating the city manager form of government. We hold that the voters of Fayette County abolished the City of Lexington and its government when they adopted urban county government. KRS 67A.010–040 provided an alternate procedure for the abolition of the city manager form of government which was used in this instance.

It is contended that Article 11, Sections 201 and 202, of the plan of merger which divides the county into three taxing districts and authorizes ad valorem taxation in each district at a rate commensurate with governmental services provided in the district is in violation of Sections 171, 172 and 172A of the Constitution.

We hold that Section 172A of the Constitution expressly authorizes the General Assembly to provide for reasonable differences in the rate of ad valorem taxation within different areas of the same taxing district on that class of property which includes the surface of the land. Those differences shall relate directly to differences between nonrevenue-producing governmental services and benefits giving land urban character which are furnished in one or several areas in contrast to other areas of the taxing district. KRS 82.085 expressly authorizes cities of the second class to levy ad valorem taxes at a different rate pursuant to that section of the Constitution. Since urban county government in Fayette County possesses all statutory powers granted to second-class cities it has authority to levy ad valorem taxes at different rates depending upon governmental services rendered.

Sections 2.03 and 2.04 of the Charter are attacked upon the ground that they provide a method of annexation in violation of KRS 81.140. It is sufficient to say that KRS 81.140 deals with annexation by cities of the second class and it is inapplicable to the merged government since the City of Lexington no longer exists.

It is contended that Sections 4.01–04 are invalid because they provide for a fifteen-man legislative council three of whom shall be elected at large and twelve of whom shall be elected from individual districts in violation of Section 160 of the Constitution and upon a further ground that neither a county nor a city of the second class is presently authorized to have such a legislative body.

The trial judge concluded that the new type of government was essentially a city and as such would be subject to the provisions of Section 160 of the Constitution. He further concluded that Section 4 of the Constitution confers powers of self-determination upon the citizens of Fayette County which override the limitations imposed by Section 160. We think the trial court erred in this conclusion.

First, Section 4 of the Constitution pertains to the people of the entire Commonwealth and does not confer any special rights on the citizens of a county. Second, we have already indicated that the new form of government authorized by the statute is not a city. Since it is not a city the provisions of Section 160 of the Constitution are not applicable to it. Third, the type of legislative body which will prevail in the new government is a matter of governmental structure rather than governmental power and KRS 67A.010–040 authorizes local determination of the structure of government.

The attack made upon Sections 4.05, 4.06 and 4.07 of the plan of merger likewise fail to recognize the distinction between the powers to be exercised by the new government and the structural forms that it may take. Those sections deal only with governmental structure and we affirm the judgment upholding them.

Article 5 of the plan of merger pertains to the office of mayor. Sections 5.02, 5.05, 5.06, 5.09 and 5.10 of that Article set forth the qualifications, term of office, manner of election, veto powers, and method of filling vacancies as relates to the mayor and also provide for a chief administrative officer and establish his duties. These matters all relate to the structure of government and the judgment upholding these Sections is affirmed.

■■■ Section 5.03 fixes the salary of the mayor at $25,000.00 per annum. The statutes limiting the salary of the mayors of the cities of the second class are not applicable. It is contended however that the salary exceeds the limits established by Section 246 of the Constitution. The salary restrictions of Section 246 of the Constitution are applicable only to public officers directly named and designated by the Constitution. Board of Education of Graves County v. DeWeese, Ky., 343 S. W.2d 598 (1960). The chief executive officer of urban county government is not so named or designated.

■■■ The Charter is not invalid because it alters the duties and functions of the Budget Commission. The Budget Commission is established by statute. As previously indicated herein, counties which adopt urban county government constitute a separate classification of counties and they are exempt as a class from the provisions of statutes regarding counties generally except to the extent that such statutes authorize the exercise of a power of government. The statutes creating budget commissions are inapplicable to urban county government.

■■ It is contended that KRS 84.320 requires the appointment of a city clerk. This contention is not valid since the city has been abolished. It also follows that the two years remaining in the term of the present mayor have been extinguished. Whether the mayor of the new government can succeed himself is a question of the structure of government and the provision of the Charter permitting succession is not invalid.

Some question is raised as to the validity of the Charter provision which by implication permits repeal by the urban county government of some state election laws. No instance of any such attempted repeal has been called to our attention and we decline to pass upon the matter until such time as a justiciable controversy in that regard is presented to us.

We come now to a consideration of the issues raised in regard to those provisions of the Charter for merit and pension systems. With two exceptions, the circuit court rejected the attacks made on those provisions by various parties, some of the attacks being rejected on the merits and others on the ground that they did not present a justiciable controversy. One provision that was held invalid was that part of Section 9.05 permitting the Civil Service Commission to hear disciplinary cases against policemen and firemen, this provision being invalidated on the ground that it was contrary to KRS 95.450, which relates to the disciplining of policemen and firemen in cities of the second or third class. Also held invalid were Sections 16.05 and 16.07, which provide for disciplining of employees and appointed officers, by the Civil Service Commission acting as a Board of Ethics, for violation of the code of ethics prescribed for the urban government. The latter sections were held to be in violation of KRS 90.360, which relates to the disciplining of city employees in cities of the second or third class, and in violation of KRS 95.450(1), which relates to disciplining of policemen and firemen in cities of the second or third class.

The rejected attacks on the provisions of the Charter relating to merit and pension systems have been renewed on this appeal by various parties, primarily those parties who represent the general city employees of the City of Lexington and the policemen and firemen of that city. Their concerns are that their opportunities for promotion or advancement may be impaired by bringing into the merit systems the employees of Fayette County; that the council of the merged government may adopt a new merit system that will not provide full protection for employees; that the administration of the merit and pension systems by the administrative branch of the merged government may embroil the systems in politics; and that the vested rights of the active and retired members of the pension systems of the City of Lexington in the funds of those systems, by virtue of contributions heretofore made by or for those members, will be impaired or diluted by bringing into those systems the employees of Fayette County and new employees of the merged government.

The attacks are in the main directed against:

1. The provisions of Section 9.03 of the Charter that all employees of Lexington or Fayette County not covered by the merit system of the City of Lexington shall, on the establishment of the merged government, be "placed under the classified civil service at a classification level commensurate with the kind and type of duties assigned to said employees by the City of Lexington or the County of Fayette immediately prior to the effective date of this Charter," and that the employees so brought into the system shall not be subject to any initial examination or certification requirements.

2. The provisions of Section 9.04 of the Charter authorizing the Council of the merged government, within two years after the effective date of the Charter, to adopt a new merit system plan covering employees of the merged government.

3. The provisions of Section 9.05 of the Charter placing the administration of the merit system in the hands of the administrative branch of the merged government.

4. The provisions of Section 9.08 of the Charter that all new employees entering the civil service of the merged government after the effective date of the Charter "shall be enrolled as members of the police and firemen or other employee pension plan in accordance with the terms and conditions for membership therein," and that the employees of the City of Lexington or of Fayette County brought into the merit system in accordance with Section 9.03 of the Charter may be eligible for membership in the pension plans under conditions prescribed by ordinance by the Council of the merged government.

5. The provisions of Section 9.09 of the Charter that the administrative branch of the merged government shall administer the pension systems.

The arguments advanced in support of the attacks made on the above-mentioned provisions of the Charter relating to merit and pension systems have many facets, but they rest almost exclusively on one or both of these two basic propositions: (1) The urban county government unit is a *city* and therefore is subject to the statutes governing city merit and pension systems; (2) the making of provision for merit and pension systems for the employees of the merged government is a *power* of that government which, by virtue of KRS 67A.-040, is limited by the statutes applicable to second-class cities.

■■ The determination made at a preceding point in this opinion that the urban county governmental unit is *not a city* destroys the first proposition above stated. And the distinction made at another preceding point in this opinion, between *powers* and *structure,* establishes the basis for destruction of the second proposition. We think it is clear that the providing of merit and pension systems for the personnel of

the merged government is a matter of the *structure* of that government, and not in the category of a *power* within the meaning of KRS 67A.040; therefore, the statutes governing merit and pension systems for cities of the second class do not control the merged government.

 Once it is decided that the merged government is not controlled by the *statutes* regulating merit and pension systems for cities, the entire structure of the arguments attacking the Charter on this phase of the case collapses. This includes the argument that under KRS 90.400(6) an "inviolable contract" was created between the City of Lexington and its employees, when the pension systems were established by the city, which gave the employees vested rights both as to pensions and as to protected employment under the merit system, that could not be impaired. The answer to that argument, as to *merit system* protection, is that while the *City of Lexington* could not extinguish that protection, no guarantee was made by the state that the city would forever remain in existence; when the city ceases to exist no right to continued protected employment by the city can remain to enforce, because the city simply no longer is an employing entity. As concerns *pension* rights, it is of course true that the termination of the existence of the City of Lexington will not extinguish the assets of the pension funds, and those active or retired members of the pension systems by and for whom contributions were made will have vested rights in those assets. But the continued existence of the pension system in its previous form and strictly in accordance with the previous statutes governing city pension systems is not essential to the protection of those vested rights. Protection against dilution by the addition of new members (which is the main concern of the protesting appellants) could be provided by earmarking or segregating the present assets as a trust fund for the present active or retired members, following the pattern of KRS 21.520. Section 9.08 of the Charter

expressly provides that in no case shall extension of the membership in any pension plan result in the impairment, curtailment or diminishment of any right or benefit of persons who were members on the effective date of the Charter. We think there is ample basis for protection in that provision.

 It is our conclusion, on this phase of the case, that those portions of the judgment which rejected attacks on the parts of the Charter relating to merit and pension systems should be affirmed. By the same token we think that those portions of the judgment *invalidating* parts of Sections 9.05, 16.05 and 16.07 of the Charter (from which the city has appealed) should be *reversed;* those parts were held invalid as in violation of *statutes* relating to cities of the second class, and for the reasons hereinbefore stated we hold that those statutes do not control the urban county government. The mere fact that the Charter sections in question do not specifically set forth due process procedures for hearings does not require that they be invalidated. The supplying of due process procedures in the application of the sections will be sufficient. In the event of arbitrary action the courts will provide a remedy.

Attacks made by some of the appellants on Sections 7.02, 7.03 and 7.04 of the Charter, which relate to membership on the Police and Firemen's Pension Fund Board, and the organization of the Civil Service Commission, fail likewise for the reasons just above stated as to Sections 9.05, 16.05 and 16.07.

 The trial court invalidated the Charter provision which purported to terminate the Urban Renewal and Community Development Agency. This agency poses a particular problem for the reason that it is a corporate body by virtue of KRS 99.360 rather than a division of the city government of the City of Lexington, Kentucky. As a result of this separate corporate existence, the vote to abolish the City of Lex-

ington cannot be said to terminate automatically the Urban Renewal and Cummunity Development Agency. The agency's area of operation was fixed by statute when it was created and it may continue to operate within that area as a public body, corporate and politic, with the powers granted by statute.

Likewise we feel that the Social Services Advisory Committee established for each county by KRS 205.330 is not a part of local county government but was designed to perform an advisory service for a department of state government. Consequently it must remain intact and its membership and duties cannot be changed by the Charter.

A majority of the court is of the opinion that the portion of the Charter providing that no amendment which has the effect of abolishing the Charter shall become effective until such time as the General Assembly of Kentucky has established a successor government to replace and supersede the government established by the Charter is invalid.

In the absence of legislation prescribing a method of abolition we do not undertake at this time to say what form of local government would prevail in the event the Charter should be abolished.

The trial court ordered that $10,000.00 be taxed as costs for attorneys' fees for the attorneys who instituted the class action to contest the validity of the Charter. This allowance was made on the theory that the attorneys performed a valuable public service to all the citizens of the county and that it would be inequitable to require the individual parties in whose names the suit was maintained to be solely responsible for the costs incurred.

The fee allowed was adjudged to be borne equally by the city and county. The city has appealed from the allowance, the county has not.

With certain exceptions not applicable here Kentucky follows the general rule which does not permit the allowance of attorneys' fees in the absence of a statute or contract expressly providing therefor. Dulworth and Burress Tobacco Warehouse Company v. Burress, Ky., 369 S.W.2d 129 (1963). No statute is cited which authorizes the allowance of a fee in a case of this nature and the claim for fee was not based upon a contract of employment. The allowance of the attorneys' fee was erroneous.

We must face the question of whether the failure of the county to appeal from the allocation of one-half of the fee against it was an acquiescence in the ruling of the trial court which rendered it liable for one-half of the fee even though the allowance of the fee was erroneous. It is the opinion of a majority of the members of this court that in the unusual circumstances of this case where the ultimate responsibility for the payment of the fee will devolve upon the urban county government, a body which could not appeal as it was not then in existence, the failure of the county to appeal should not prevent review since the matter of the allowance is properly before us in the appeal of other parties. That portion of the judgment which allowed attorneys' fees to be taxed as costs is set aside in its entirety.

The judgment of the trial court as to the validity of some portions of the Charter was not challenged on this appeal. We have not discussed and do not pass upon any issue not contested before us. We affirm the judgment of the trial court that the Charter is not invalidated as a whole because certain portions of it have been declared invalid. Those sections declared invalid are stricken from the Charter by reason of the severability clause contained in Section 13.02.

We affirm the judgment of the trial court insofar as it ruled upon the specific objections to the Charter as set forth in

Appendix 1 to the opinion of the trial court, Sections A, B, and C, with the following exceptions:

(1) We affirm the holding set forth in Section A(2) of the Appendix that Article 2 of the Charter to the extent that it creates service districts and taxing districts is not invalid but we express no opinion as to the validity of that part of Section 2.02 which provides the initial tax rates which shall be levied since this question was not presented to the court.

(2) We affirm the ruling contained in Section A(5) of the Appendix that Section 11.02 of the Charter which limits the powers of the fiscal court is valid but we reverse the ruling contained in Section A(37) of the Appendix which holds that the members of the fiscal court shall serve without compensation. See City of Frankfort v. Triplett, Ky., 365 S.W.2d 328 (1963).

(3) We reverse the ruling contained in Section A(28) of the Appendix that the provisions of Section 7.10 of the Charter are valid insofar as that section might be construed to impinge upon the duties and membership of the Social Services Advisory Committee created by KRS 205.330.

(4) We reverse the ruling contained in Section B(1) of the Appendix that the provisions of Section 9.05 insofar as it permits the Civil Service Commission to hear disciplinary cases against police and fire officers is invalid as contrary to KRS 95.450 and the ruling contained in Section B(3) of the Appendix that Sections 16.05 and 16.07 of the Charter concerning the Code of Ethics and Board of Ethics are invalid.

(5) With respect to the rulings set forth in Sections B(5) and (7) of the Appendix we hold that the council shall not have any right of selection or approval of the person or persons designated as trial commissioners by the county judge or as assistants by the county attorney and the Commonwealth's Attorney.

(6) We reverse the ruling of the court contained in Section B(6) of the Appendix.

(7) We express no opinion as to the rulings set forth in Appendix 1 in Section A(3), (19), (24), (28), (30), (31), (32), (33), (34), (35), (36), (39), (40), (41), (42), (43), (44), (45), (47), and (51), because these points were not contested in the briefs submitted to this court on this appeal.

It should be noted that some members of this court are of the opinion that urban county government as it is constituted in Fayette County may be faced with practical problems which no one has as yet foreseen. As one example we call attention to Section 157 of the Constitution which provides that cities and towns alone may levy taxes at a rate in excess of fifty cents per one-hundred dollars' evaluation. Counties and other taxing districts are not permitted to exceed the rate of fifty cents per one-hundred dollars' evaluation.

In this opinion we hold that urban county government is not a city and thus it escapes the strictures of Section 160 of the Constitution. If it is not a city can it levy taxes at a rate in excess of fifty cents per one-hundred dollars' evaluation in view of the limitations imposed by Section 157? This question was not litigated and we do not attempt here to answer it but only point it out as one of the practical difficulties which have yet to be resolved.

The allocation of Rural Road Funds under KRS 177.360 is a matter likely to precipitate controversy and no doubt there are many other problems lurking beneath the surface which will require judicial determination. Urban county government appears destined to become a fruitful field of judicial inquiry.

The judgment is affirmed in part and reversed in part with directions that a new

judgment be entered in conformity with this opinion.

PALMORE, C. J., and JONES, MILLI-KEN, REED, STEINFELD and STE-PHENSON, JJ., concur.

OSBORNE, J., dissents.

Separate concurring opinion by REED, J., dissenting opinion by OSBORNE, J.

REED, Justice (concurring).

In view of the manner of the presentation of this case for decision by this court and in view of the timing employed by the litigants when considered in the light of the understandable public concern evidenced in the communications media, I deem it proper to record some of my views concerning this case. In the first place, in spite of characterization of the "long awaited" decision of the Court of Appeals concerning the constitutionality of a merger plan of government, the simple truth is that the jurisdiction of this court was not invoked concerning the constitutionality of the merger plan until after the so-called "Charter" had been submitted to the people of Lexington and Fayette County for adoption or rejection at a public election. An additional truth is that the last briefs filed by some of the parties to this appeal were not presented to this court until about December 10, 1973. It seems to me that much of the speculation and uncertainty could well have been avoided by a true adversary testing before the courts of this plan prior to its submission to the local electorate. After all, the suit pended in the circuit court from January of 1973. It became necessary for this court, on its own motion, to direct acceleration of the briefing procedure in order to make some final disposition concerning the structure of government in Lexington and Fayette County that could legally exist on January 1, 1974.

The structure of government under question is new in this Commonwealth. The enabling statute, KRS 67A.010, et seq., the constitutionality of which we upheld in Pinchback v. Stephens, Ky., 484 S.W.2d 327 (1972), applies to 119 counties of the 120 counties presently comprising this Commonwealth; therefore, the decision in this case required no small measure of consideration in view of its impact on local government within the Commonwealth.

I am persuaded that the unanimous decision of this court in the Stephens case was correct. If the Constitution of Kentucky means what it says, it is not unreasonable to assume that significance should be attached to its silence. I can find no prohibition expressed in the 1891 Constitution which would prohibit the legislature from validly adopting KRS 67A.010 et seq. The elastic language within the several sections of the Constitution referring to local governmental units reinforces this conclusion. Furthermore, when courts consider the constitutionality of legislation, the circumstances that the change proposed shall be effected only upon a vote of the people affected is a persuasive element. The judicial philosophy that recoils from imposing court-made law as an authoritarian solution based only upon the subjective notion of wisdom of the judges rather than action by the people, either directly or by elected representatives, should be hesitant to reject action by the elected representatives of the poeple which extends to the electorate the right for itself to determine action that is recommended as an improvement.

The majority opinion says that the General Assembly should bear the responsibility for the wisdom of the action. I would prefer to add that the advocates of the proposition and the electorate who adopted it should also bear responsibility for the wisdom of the change.

The real difficulty in this case, in my view, is not the validity of the action of the General Assembly but is rather the plainly apparent mistaken notions of the draftsmen of the document referred to as the "Charter." One is immediately struck by the erroneous view adopted by the draftsmen when they called the instrument

a "Charter." The enabling statute authorized the formulation and submission of a "comprehensive plan." This choice of language by the legislature evidences to me that only structure and not ultimate governmental power was envisioned. Our decision today permits no more governmental power to be exercised over the people of Fayette County than was exercisable by either the City of Lexington or Fayette County prior to the approval of urban county government by the people of the affected city and county. The substantial effect of the adoption of the new structure is to allow exercise of the governmental power of a second class city on a county-wide basis. The city is destroyed, the county remains as a geographic unit. The recitation in the "Charter" that it will be "liberally construed" to accomplish its purposes illustrates again a mistaken notion concerning the extent of authority provided by the legislature.

The simple truth is that any provision of the "Charter" may be deleted or changed by action of the General Assembly by adoption of a general law applicable to the class "urban county government." Any recitation in the "Charter" surely could not repeal, amend or prevent any such contrary direction by the General Assembly, nor are the courts of this Commonwealth bound to construe the "Charter" in any fashion other than by the accepted rules of law.

The "Charter" certainly is subject to the supervisory control of the General Assembly and is subject to the requirements of the Constitution of Kentucky. For example, Section 27 of our Constitution explicitly provides for a tripartite government in the entire Commonwealth consisting of an executive department, a legislative department, and a judicial department. Section 28 of the same constitution requires that no person or collection of persons being of one of those departments shall exercise any power properly belonging to either of the others.

Article 10 of the "Charter" is entitled "urban county courts." In section 10.02 of the "Charter" the draftsmen undertake to provide for the status of the Fayette Circuit Court. The Fayette Circuit Court is created by the Constitution in section 125 thereof. Neither the urban county government nor the county judge as administrator of the urban county courts possesses any authority whatever to exercise any function, administrative, supervisory or otherwise, over the Fayette Circuit Court, and so long as the Constitution of Kentucky provides for the doctrine of the separation of powers, neither the legislature nor an amendment to the "Charter" could validly provide otherwise.

The same mistaken notion concerning the extent of authority has caused this court to strike as invalid that portion of the "Charter" which undertakes to require the General Assembly to act if an amendment which has the effect of abolishing the "Charter" shall become effective. It is plainly envisioned in the enabling statute that the people affected who have the right to adopt this structure of government also have the right to amend it, including the right to abolish it. When the draftsmen of the "Charter" undertook to interpose the requirement of action by the General Assembly before any such abolition would be effected, they impermissibly undertook to dictate legislative action by the legislative body of this Commonwealth and they further undertook to impose a condition not envisioned by the General Assembly. The majority opinion does not undertake to say what form of local government would prevail in the event the "Charter" should be abolished by action of the electorate. To me it is unthinkable that in the absence of contrary direction by the General Assembly, the form of government would be other than that of a county, if the reasoning of the majority opinion in its other areas is carried to a logical conclusion.

The majority opinion suggests a problem concerning the applicability of Section 157 of the Constitution prescribing tax rates.

The legislation here, however, provides that the urban county government shall possess the governmental powers that the City of Lexington possessed. It would appear to me that the constitutional provisions concerning tax rates applicable to the City of Lexington would apply to the urban county government.

The allocation of rural road funds and other problems either discussed or implied in the majority opinion will doubtless be the subject of action by the General Assembly. I deem it helpful to point out in this aspect that the General Assembly must act by means of general laws within the classification urban county government which, as we have said, has now been made applicable upon a vote by the affected electorate to 119 counties to this state.

The decision of this court should be recognized as approving an endeavor by the people to improve the structure of their local government. The decision should also be recognized as assuring the right of the people to change or abolish that new structure if it should prove sufficiently unsatisfactory or unworkable. The limitations imposed by this court are important and should not be ignored by the officials of the new governmental unit. The majority opinion predicts that urban county government will be a fruitful source of future litigation. It is my hope that the necessity for some of the predicted future litigation will be obviated by legislative action by the General Assembly and by recognition of error made by the draftsmen of the "Charter" concerning the extent of their constitutional authority. In view of the increasing complexities caused by urban concentration, and the onerous burdens thrust upon citizens caused in part by needless duplication of governmental activities, one should have to be completely insensitive not to hope that this experiment will succeed.

OSBORNE, Justice (dissenting).

A reexamination of this entire matter has convinced me that that we were in error when we decided Pinchback v. Stephens, Ky., 484 S.W.2d 327 (1972). I am now convinced that the constitution of this state will not permit any county or municipal governmental structure, other than that specifically outlined in the constitution and that KRS 67A.010 etc., creates a structure completely foreign to that document. While it is true that the Supreme Court of Indiana in Dortch v. Lugar, Ind., 266 N. E.2d 25 (1971), did permit the consolidation of city and county governments in that state without a specific amendment or provision in the constitution, there is no indication that the Constitution of Indiana was as detailed upon this subject as is the constitution of this state.

When our neighboring state of Tennessee was faced with this problem they specifically amended Article 11, § 9, of the constitution of that state and in explicit terms authorized the consolidation of municipal and county governments, see Frazer v. Carr, 210 Tenn. 565, 360 S.W.2d 449 (1962).

As a result of the majority opinion today rendered, I foresee vast uncertainty and a sea of litigation with a result that will ultimately totally emasculate our constitutional provisions as they relate to local government. Our constitution is much too detailed to permit of this a totally new form of local government. A cursory examination of that document reveals that there are thirty-five sections that deal with cities alone, not to mention the vast provisions for the operation and control of county government.

For my parting observation upon the matter, I would like to point out that § 156 of the Constitution provides:

"The cities and towns of this Commonwealth, for the purposes of their organization and government, shall be divided into six classes. The organization and powers of each class shall be defined and provided for by *general* law, so that all municipal corporations of the same class

shall possess the same powers and be subject to the same restrictions."

(Emphasis ours).

If I am correct in my assumption that Lexington is either a city or town, then under this provision of the constitution, it must be placed in one of the six classes as provided therein and it must be governed by the general laws ·as they apply to that class. It must possess the same powers and be subject to the same restrictions as all other cities of that class. It matters not what rationalization is used nor how many thousands of words are poured upon the subject, this provision of the constitution is being violated by the majority opinion today.

For the foregoing reasons I most respectfully dissent.